**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

**No. 17-4230**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

NADER ABDALLAH,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Newport News. Raymond A. Jackson, District Judge. (4:15-cr-00018-RAJ-LRL-3)

Argued: September 25, 2018                    Decided: December 18, 2018

Before GREGORY, Chief Judge, WYNN and HARRIS, Circuit Judges.

Reversed and remanded by published opinion. Judge Wynn wrote the opinion, in which Chief Judge Gregory and Judge Harris joined.

**ARGUED:** Kim Michelle Crump, Norfolk, Virginia, for Appellant. Kevin Patrick Hudson, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee. **ON BRIEF:** Dana J. Boente, United States Attorney, Alexandria, Virginia, Eric Hurt, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.

WYNN, Circuit Judge:

A jury convicted Defendant Nader Abdallah ("Defendant") of several offenses related to his alleged distribution of controlled substances. On appeal, Defendant raises numerous grounds for setting aside his convictions.

For reasons that follow, we conclude that the district court reversibly erred in refusing to suppress inculpatory statements Defendant made during a custodial interrogation. We further hold that the district court erred in failing to conduct an *in camera* review of confidential law enforcement records requested by Defendant, when Defendant established the confidential records plausibly contained materially favorable information. Accordingly, we reverse and remand the case to the district court for further proceedings consistent with this opinion.

I.

A.

In June 2012, law enforcement officers began investigating the sale and distribution of unlawful synthetic cannabinoids (known as "spice") in Newport News, Virginia and the surrounding area. During the investigation, the officers received complaints that spice was being sold at a local Red Barn gas station and convenience store that was owned and operated by Defendant and his son. The officers conducted multiple controlled purchases of spice at the Red Barn, the last of which occurred on September 16, 2014.

Two days after the last purchase, the officers executed a search warrant at the Red Barn. Inside, they found and seized cardboard parcels filled with packages of spice; a

digital scale; $109,308 in cash; and two keys. One of the keys opened a storage unit containing more spice and the other key opened Defendant's safe deposit box. After obtaining another warrant, the officers seized an additional $701,450 in cash from the safe deposit box.

Thereafter, the United States Customs and Border Protection sent Defendant notice that it had confiscated his property and that he could file an administrative petition for its return. Defendant filed two sworn petitions to recover the two sums of cash that had been confiscated from the Red Barn and the safe deposit box. Each petition stated: "I maintain my earnings in cash form for religious reasons. I am a Muslim and I strictly adhere to the tenets of my faith. One of these is the law against usury. I, therefore, do not maintain a bank account and whenever possible keep my money in cash . . . and other tangible forms that do not accrue interest." J.A. 777–79. But Defendant had multiple bank accounts and had conducted bank transactions on the same day.

After the search, Defendant sold the Red Barn and bought another building at the former Newport Video location. Thereafter, Defendant's son emailed Michael McMahon—the owner of a spice distribution company—and informed McMahon that he and Defendant wanted to use the Newport Video location to sell spice wholesale. The officers intercepted these emails and began to track the location's packages. On April 20, 2015, the officers executed a search warrant at the Newport Video location, during which they found additional spice, a revolver, crack cocaine, drug paraphernalia, and $10,000.

B.

Five days before the Newport Video search, a federal grand jury returned its first indictment against Defendant and, that same day, a federal court issued an arrest warrant for Defendant. The officers arrested Defendant at the Newport Video location and took him to the Newport News Police Headquarters for interrogation.

Three officers were present for Defendant's interrogation: (1) Special Agent Lewis of the Department of Homeland Security, (2) Inspector Sylvester of the United States Postal Inspection Service, and (3) Detective Calhoon of the Newport News Police Department. Special Agent Lewis and Inspector Sylvester later recounted Defendant's interrogation during a suppression hearing before the United States District Court for the Eastern District of Virginia. Defendant exercised his right not to testify, and the district court ultimately adopted the officers' recitation of events. *See United States v. Abdallah*, 196 F.Supp.3d 599 (E.D. Va. 2016).

The officers chose not to record the interrogation. Instead, Inspector Sylvester took notes and Detective Calhoon observed while Special Agent Lewis interrogated Defendant. According to the officers, Special Agent Lewis started the interrogation by reading Defendant his *Miranda* rights. Defendant purportedly interrupted "approximately halfway" through to inform the officers that he "wasn't going to say anything at all." J.A. 79; *see also Abdallah*, 196 F.Supp.3d at 600. Agent Lewis responded by stating, "Well, just let me finish your Warning first." J.A. 79. Immediately after the warning, Agent Lewis asked, "Do you even know why you're under arrest[?]" Defendant responded, "No, tell me." J.A. 79. Agent Lewis then repeated the *Miranda*

4

warning. This time, Defendant did not interrupt, and Defendant indicated that he understood his rights. Defendant subsequently made multiple inculpatory statements.

The officers also described Defendant's demeanor during the interrogation. Both Special Agent Lewis and Inspector Sylvester testified that Defendant was "lucid," "very upbeat, jovial, [and] very animated." J.A. 79, 112, 127. During cross-examination, Agent Lewis agreed with defense counsel that Defendant was "very cooperative," not difficult, "very forthcoming," and was not "the type of person that had an attitude." J.A. 96–97. Finally, Agent Lewis acknowledged that Defendant's demeanor "[s]urprisingly" did not "change at all during the course of the interview." J.A. 82.

C.

On April 1, 2016, Defendant filed a motion to suppress all statements made during his custodial interrogation. Defendant first argued that by stating that he "was not going to say anything at all," he unambiguously requested to remain silent. Because the officers failed to scrupulously honor Defendant's request, Defendant maintained his statements were inadmissible. The district court denied Defendant's suppression motion, finding his invocation to be "ambiguous, especially given the fact that he voluntarily waived his *Miranda* rights minutes later once informed of the charges against him and the subject of the interrogation." *Abdallah*, 196 F.Supp.3d at 604.

Defendant also sought suppression because "it is not clear what if any *Miranda* warnings were given." J.A. 46. Defendant noted the officers did not record the interrogation and only Inspector Sylvester took notes. Inspector Sylvester's handwritten notes first state, "*Miranda* from DHS form-understood," and, on the next line, Defendant

5

was "Not going to say anything at all." J.A. 154. Inspector Sylvester's contemporaneous notes nowhere suggest that Defendant interrupted his *Miranda* warnings.

After the interrogation, Agent Lewis drafted a report from his memory. Agent Lewis emailed that draft to Detective Calhoon and Inspector Sylvester, which prompted "some modifications." J.A. 92. Eight days after the interrogation, Agent Lewis issued a final typewritten report indicating that Defendant interjected halfway through the first set of *Miranda* warnings. Claiming inconsistencies between Inspector Sylvester's contemporaneous notes and the final report, Defendant requested production of the officers' emails pertaining to the drafting of the report. The district court denied Defendant's production request, relying on Agent Lewis's representation that he had not removed a request for counsel or a request to remain silent.

On October 2, 2016, Defendant moved for the district court to reconsider his motions requesting production of the drafting exchange and for suppression of his statement. In support, Defendant asserted that, after reviewing a copy of Agent Lewis's grand jury testimony, Defendant found what he considered to be additional inconsistencies among Agent Lewis's grand jury testimony, his suppression hearing testimony, and the final report.

In particular, during the suppression hearing, Agent Lewis testified that he did not obtain a written *Miranda* waiver from Defendant because he did not want to "interrupt the flow" of the interrogation. J.A. 101–02. Agent Lewis also testified that Defendant was "moving a mile a minute" and he "did not want to stifle the statements that [Defendant] was making." J.A. 101–02. By contrast, Agent Lewis testified to the grand

6

jury that Defendant had waived his *Miranda* rights "both orally and in writing" *prior* to the interrogation. J.A. 1256. Furthermore, Agent Lewis told the grand jury that Defendant "started off slow" after receiving the *Miranda* warning—contrary to Agent Lewis's suppression hearing testimony that Defendant was "moving a mile a minute." J.A. 1264. Finally, Agent Lewis did not testify before the grand jury that Defendant interrupted his *Miranda* warnings to say he "wasn't going to say anything at all." On March 16, 2017, the district court again denied Defendant's production and suppression motions.

D.

Beginning October 4, 2016, Defendant was tried by jury before the district court. During Defendant's trial, the government introduced much of Defendant's confession through Inspector Sylvester's testimony. For example, Inspector Sylvester informed the jury that Defendant had provided a detailed explanation of his spice distribution relationship with McMahon. Defendant also told the officers that he sold spice to "pretty much everybody" and had sold approximately 10,000 grams of spice. When asked about the crack cocaine and paraphernalia found during the Newport Video search, Defendant admitted that he used crack cocaine and had smoked crack cocaine two days prior. Defendant also stated that he would give prostitutes crack cocaine as a "bonus." Regarding the safe deposit box, Defendant told the officers that he had a second safe deposit box that the officers were "too late" to seize. From that box, Defendant escaped with $150,000. Finally, Inspector Sylvester testified that Defendant "said his understanding was that [spice] was illegal under federal law." J.A. 343. Relying on that

7

statement in Defendant's confession, the government emphasized during closing arguments that Defendant "told agents [spice] was illegal." J.A. 1148.

After twelve days of trial, the jury convicted Defendant of (1) one count of conspiring to distribute Schedule I controlled substances and controlled substance analogues (i.e., spice), in violation of 21 U.S.C. § 846; (2) one count of possessing a Schedule I controlled substance (i.e., spice) with intent to distribute, in violation of 18 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); (3) one count of distributing and possessing with intent to distribute a Schedule II controlled substance (i.e., crack cocaine), in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2; and (4) two counts of making false statements to the federal government (i.e., one count for each of his sworn petitions to Customs), in violation of 18 U.S.C. § 1001(a)(3).

Defendant timely appealed.

## II.

On appeal, Defendant first argues that the officers violated his Fifth Amendment rights when the officers continued to question him after he unambiguously invoked his right to remain silent and therefore that the district court erred by failing to suppress the statements Defendant made in response to those questions. "We review the factual findings underlying a motion to suppress for clear error and the district court's legal determinations de novo. When a suppression motion has been denied, this Court reviews the evidence in the light most favorable to the government." *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013) (citation omitted). On review, we agree with Defendant. Because law enforcement officers failed to scrupulously honor Defendant's

8

unequivocal invocation of the right to remain silent, the district court erred by failing to grant Defendant's motions to suppress and reconsider suppression.

A.

The Fifth Amendment of the United States Constitution provides: "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]"  U.S. Const. amend. V.  To protect this constitutional right against self-incrimination, the Supreme Court's landmark decision in *Miranda v. Arizona* established certain "procedural safeguards" that officers must comply with to subject a suspect to custodial interrogation. 384 U.S. 436, 478–79 (1966).  First, suspects must be informed of their "right to remain silent" and their "right to the presence of an attorney."  *Id.* at 444.  If a suspect "indicates *in any manner, at any time* prior to or during questioning, that he wishes to remain silent, the interrogation *must cease*."  *Id.* at 473–74 (emphases added).  Similarly, if a suspect "states that he wants an attorney, the interrogation must cease until an attorney is present."  *Id.* at 474.  Thus, by invoking either the right to remain silent or the right to counsel, a suspect has the "right to cut off questioning" and officers must cease questioning the suspect. *Id.*

To invoke the right to remain silent or the right to counsel and thereby cut off questioning, the suspect's invocation must be "unambiguous."  *Berghuis v. Thompkins*, 560 U.S. 370, 381–82 (2010) (request to remain silent); *Davis v. United States*, 512 U.S. 452, 459 (1994) (request for counsel).  An invocation is unambiguous when a "reasonable police officer under the circumstances would have understood" the suspect intended to invoke his Fifth Amendment rights.  *Tice v. Johnson*, 647 F.3d 87, 107 (4th

9

Cir. 2011); *Davis*, 512 U.S. at 459. Accordingly, "a suspect need not speak with the discrimination of an Oxford don" to invoke his Fifth Amendment rights. *Davis*, 512 U.S. at 459; *see also Emspak v. United States*, 349 U.S. 190, 194 (1955) (explaining that "no ritualistic formula or talismanic phrase is essential in order to invoke" Fifth Amendment rights). This objective inquiry "'avoids difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity." *Thompkins*, 560 U.S. at 381–82 (citing *Davis*, 512 U.S. at 458–59).

In its suppression memorandum, the district court found that "Defendant interrupted Agent [Lewis's *Miranda* warnings] and stated that he '*wasn't going to say anything at all*.'" *Abdallah*, 196 F.Supp.3d at 600 (emphasis added). Numerous courts—including this Court—have held that materially indistinguishable statements amount to an unambiguous invocation of Fifth Amendment rights. For example, in *Tice v. Johnson*, this Court took the position, in a habeas case, that when a defendant told interrogators, "I have decided not to say any more," he unambiguously invoked his right to remain silent. *Tice*, 647 F.3d at 107 ("I have decided not to say any more."); *see also Jones v. Harrington*, 829 F.3d 1128, 1140 (9th Cir. 2016) ("I don't want to talk no more"); *United States v. McCarthy*, 382 F. App'x 789, 791–92 (10th Cir. 2010) ("I don't want nothing to say to anyone."); *McGraw v. Holland*, 257 F.3d 513, 515, 518 (6th Cir. 2001) ("I don't wanna talk about it."); *Arnold v. Runnels*, 421 F.3d 859, 865 (9th Cir. 2005) ("[T]he Supreme Court [never] has required that a suspect seeking to invoke his right to silence to provide any statement more explicit or more technically-worded than 'I have nothing to

10

say.'"); *United States v. Reid*, 211 F.Supp.2d 366, 372 (D. Mass. 2002) (cited favorably in *Tice*, 647 F.3d at 107) ("I have nothing else to say.").

Notwithstanding contrary and binding authority, the district court found Defendant's statement that he "'wasn't going to say anything at all' . . . ambiguous, especially given the fact that [Defendant] voluntarily waived his *Miranda* rights *minutes later* once informed of the charges against him and the subject of the invocation." *Abdallah*, 196 F.Supp.3d at 600, 604 (emphasis added). The district court erred by relying upon these post-request facts to cast ambiguity on Defendant's otherwise unambiguous request to remain silent.

When determining whether an invocation is ambiguous, courts can consider whether the "request [itself] . . . or the circumstances *leading up* to the request would render [the request] ambiguous[.]" *Smith v. Illinois*, 469 U.S. 91, 98 (1984) (emphasis added). But courts cannot cast ambiguity on an otherwise clear invocation by looking to circumstances which occurred *after* the request. In *Smith v. Illinois*, lower courts found a defendant's request for counsel to be ambiguous "*only* by looking to [the defendant's] *subsequent* responses to police questioning[.]" *Id.* at 97 (emphases in original). The Supreme Court held that a defendant's "*postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Id.* at 100 (emphasis in original). The Court reasoned "[n]o authority, and no logic, permits the interrogator to proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement . . . ." *Id.* at 99 (citation omitted).

11

Subsequently, the Supreme Court also recognized in *Berghuis v. Thompkins* that "there is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel[.]" 560 U.S. at 381. Together, *Smith* and *Thompkins* establish that courts likewise cannot use post-request facts and circumstances in determining whether a defendant unambiguously invoked his right to remain silent, let alone to cast ambiguity on an otherwise clear request to remain silent. *Accord Jones*, 829 F.3d at 1140; *United States v. Hamidullin*, 114 F.Supp.3d 388, 392 (E.D. Va. 2015).

The district court and government highlight cases outside of this Circuit in which "similar language was not considered an unequivocal invocation of the right to remain silent." *Abdallah*, 196 F.Supp.3d at 603. These cases are inapposite. For example, in *United States v. Sherrod* and *United States v. Banks*, context preceding the defendants' purported invocations rendered what otherwise might have been unambiguous language open to alternative interpretations. *See United States v. Sherrod*, 445 F.3d 980, 982 (7th Cir. 2007) (officer continually refused to answer defendant's questions); *United States v. Banks*, 78 F.3d 1190, 1196 (7th Cir. 1996) (defendant had just been arrested and placed in a squad car), *vacated on other grounds by Mills v. United States*, 519 U.S. 990 (1996), *on remand United States v. Mills*, 122 F.3d 346, 349–51 (affirming on this point). In *Banks*, the Seventh Circuit made clear:

> We believe that the magistrate judge's characterization of the statement was, *on this record*, a permissible one. [The defendant's] response of "I don't got nothing to say," *standing alone*, could be construed as an invocation of his right to remain silent. *Yet, when placed in the context of*

12

*his other comments*, the alternate interpretation—that it was merely an angry response to the form in front of him—is also possible.

78 F.3d at 1197 (emphases added).

By contrast, here the government presented no *pre-request* context suggesting Defendant's statement was nothing more than an "angry response" or otherwise casting ambiguity on Defendant's clear request to remain silent. Without pre-request context, Defendant's unambiguous statement that he "*wasn't going to say anything at all*" cannot be construed as anything but an unambiguous request to remain silent.

To the extent the government relies on cases like *Banks* to argue that an "angry" response to *Miranda* warnings generally does not qualify as an unambiguous invocation, we disagree. There is no requirement that *Miranda* invocations be measured, polite, or free of anger, in the assessment of the officers to whom they are directed. Indeed, a purported invocation that is not assertive *enough* may be deemed too equivocal to pass muster under *Davis*, *see* 512 U.S. at 459; if invocations that are perceived as *overly* assertive also are disqualified, then suspects will be left to walk a tonal tightrope, with no margin for error on either side. And even if we did agree with the government's premise, we note, it would make no difference on the facts of this case: as the officers' own suppression testimony makes clear, the Defendant in fact was not angry but instead "very upbeat [and] jovial" throughout his interrogation. J.A. 79.

The government also argues that because the Defendant made his statement before Agent Lewis completed the *Miranda* warnings, he could not have invoked his right to remain silent "knowingly and intelligently." Appellee's Br. at 20. But there is no

requirement that an unambiguous invocation of *Miranda* rights also be "knowing and intelligent." That is the standard applied to the *waiver* of *Miranda* and other constitutional rights, not to the invocation of such rights. *See Thompkins*, 560 U.S. at 382.; *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (because courts "indulge every reasonable presumption against waiver" of constitutional rights, such waivers must be knowing and intelligent).

Tellingly, the government cites no case—nor have we found any such case—holding that defendants must wait until the completion of *Miranda* warnings prior to invocation. At best, the government offers us a footnote from *McNeil v. Wisconsin*, which it quotes as saying "we have in fact never held that a person can invoke his *Miranda* rights anticipatorily . . . ." Appellee's Br. at 21. But that footnote goes on to state: "We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, *in a context other than 'custodial interrogation*[.]'" *McNeil v. Wisconsin*, 501 U.S. 171, 182 n.3 (1991) (emphasis added).

There is a good reason that the government cannot provide us with a case. The government's argument does more than misapply the "knowing and intelligent" standard to invocations of constitutional rights. It also rests on an unwarranted assumption that *no defendant* can *ever* be aware of his constitutional rights *before* the government informs him of those rights. That assumption runs counter to the "deeply rooted" presumption in our criminal justice system that "every person [knows] the law." *Cheek v. United States*, 498 U.S. 192, 199 (1991). When criminal defendants complain that complex statutes are too "difficult for the average citizen to know and comprehend the extent of the duties and

14

obligations imposed by" law, we nevertheless apply this presumption and hold that "ignorance of the law . . . is no defense to criminal prosecution[.]" *Id*. at 199–200. But the government now asks us to adopt the *opposite* presumption—that defendants *cannot know* their constitutional rights prior to receiving a warning—in the context of those rights that *Miranda* protects—rights that *Miranda* has rendered "part of our national culture." *Dickerson v. United States*, 530 U.S. 428, 443 (2000). There is no principled reason to adopt the conflicting presumptions that defendants must know the criminal laws which *inculpate* them but cannot know the constitutional rights which *protect* them. Nor is there any reason for the law to effectively penalize a defendant who, even without receiving the warnings required by *Miranda*, is aware of his constitutional rights and chooses to exercise them.

Moreover, the theory underlying the government's argument fundamentally misconceives the relationship between *Miranda* warnings and the right to remain silent. To that end, the Supreme Court has held that defendants have a constitutional right to remain silent even when they are not subjected to custodial interrogation and thus have no right to *Miranda* warnings. *See, e.g., Minnesota v. Murphy*, 465 U.S. 420, 427 (1984) (discussing both criminal and noncriminal investigations); *see also Salinas v. Texas* (2013), 570 U.S. 178, 190–91 (Alito, J., concurring) (plurality opinion) (suspects may unequivocally invoke the privilege against self-incrimination in a non-custodial setting).

In contrast, *Miranda* warnings are "procedural safeguards" that the Supreme Court "employed to dispel the compulsion inherent in custodial surroundings." *See Miranda*, 384 U.S. at 458. Without these warnings, "no statement obtained from the defendant can

15

truly be the product of his free choice." *Id.* *Miranda* warnings are not—nor were they intended to be—a procedural stumbling block to prevent informed defendants from exercising their constitutional rights. Instead, they were instituted to inform the "unaware" of their preexisting rights and to "show the individual that his interrogators are prepared to recognize his privilege should he choose to exercise it." *Id.* at 468. The officers could not ignore Defendant's unambiguous invocation merely because they decided that Defendant's invocation was not "knowing and intelligent."

## B.

Under black-letter Fifth Amendment law, once a suspect unambiguously indicates "that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473–74. In *Michigan v. Mosley*, the Supreme Court held that the "resumption of questioning is permissible" and subsequent confessions are admissible *only if* the suspect's right to cut off questioning was "scrupulously honored." 423 U.S. 96, 101–04 (1975) (emphasis added). Questioning resumes whenever officers engage in either (1) "express questioning," or (2) "words or actions," which "the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980); *United States v. Johnson*, 734 F.3d 270, 276 (4th Cir. 2013). Under this formulation, questioning generally does not resume when officers merely make "requests for routine information necessary for basic identification purposes." *United States v. Cowan*, 674 F.3d 947, 958 (8th Cir. 2012) (citation omitted). But questioning does resume when officers "should reasonably be aware that the information sought is *directly relevant to the substantive offense charged*." *Id.* (citing *Pennsylvania v. Muniz*, 496 U.S.

16

582, 602 n. 14 (1990)) (emphasis added); *see also United States v. Molina-Gomez*, 781 F.3d 13, 24–25 (1st Cir. 2015) (Though "routine questions . . . do not constitute interrogation," defendant was interrogated when asked questions "relating to" his suspected crimes); *United States v. Burns*, 684 F.2d 1066, 1075–76 (2d Cir. 1982).

To guide the inquiry into whether a suspect's rights have been scrupulously honored, this Court has identified five non-exhaustive, non-dispositive factors:

> (1) Whether the police had given the suspect Miranda warnings at the first interrogation and the suspect acknowledged that he understood the warnings;
>
> (2) Whether the police immediately ceased the interrogation when the suspect indicated that he did not want to answer questions;
>
> (3) Whether the police resumed questioning the suspect only after the passage of a significant period of time;
>
> (4) Whether the police provided a fresh set of *Miranda* warnings before the second interrogation; and
>
> (5) Whether the second interrogation was restricted to a crime that had not been a subject of the earlier interrogation.

*Weeks v. Angelone*, 176 F.3d 249, 267 (4th Cir. 1999). Despite these factors, the touchstone remains whether a "review of the circumstances" reveals that the suspect's rights were "fully respected." *Id.* at 268 (citing *Mosley*, 423 U.S. at 104). Of particular relevance in this case are the factors inquiring whether: (1) the officers immediately ceased questioning, (2) the officers waited a "significant period of time" before resuming questioning, and (3) the interrogation involved the same crime which was the subject of the earlier investigation. What constitutes a "significant period" is a function of the degree to which "police persist[ed] in efforts to wear down the [suspect's resistance] and

17

make him change his mind." *Id.* (citing *Mosley*, 423 U.S. at 105–06). Although this Court "does not require a durational minimum" before resuming questioning, *id.*, we are mindful that "to permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* . . . ." *Mosley*, 423 U.S. at 102.

In its analysis, the district court pointed out that the *Weeks* factors militated against finding Defendant's request to remain silent was scrupulously honored. *See Abdallah*, 196 F.Supp.3d at 604 ("[T]here was not a significant passage of time between the first statement and the interrogation and they concerned the same crime."). We agree.

As was previously discussed, Defendant's statement that he "wasn't going to say anything at all" was a clear invocation of the right to remain silent. *See supra* Part II.A. Still, the interrogating officer responded, "Well, just let me finish your warning first," read Defendant his *Miranda* rights, and immediately asked Defendant, "Do you even know why you're under arrest[?]" J.A. 79, 105. Other courts have recognized that this precise question is reasonably likely to elicit an incriminating response. *See, e.g., Etheridge v. Johnson*, 49 F.Supp.2d 963, 982 (S.D. Tex. 1999), *dismissed*, 209 F.3d 718 (5th Cir. 2000); *Pirtle v. Lambert*, 150 F.Supp.2d 1078 (E.D. Wash. 2001), *vacated on other grounds by Pirtle v. Morgan*, 313 F.3d 1160 (9th Cir. 2002). And with good reason.

One can expect that criminal defendants who are asked "Do you know why you are under arrest?" will respond with a variety of incriminating, speculative statements about their substantive offenses. *See, e.g., Etheridge*, 49 F.Supp.2d at 969 ("Yes, I know I'm under arrest for killing that fifteen-year-old girl"); *Pirtle*, 150 F.Supp.2d at 1083 ("Of

18

course I do, you might as well shoot me now"). Even though Defendant stated he *wasn't going to say anything all*, Defendant was immediately asked an express question that reasonably required him to discuss his substantive offense. *Cowan*, 674 F.3d at 958. Defendant reasonably responded with several incriminating statements. And those statements were ultimately used to convict Defendant. On these facts, it is clear that Defendant's rights were not scrupulously honored as required by *Weeks* and *Mosley*. *Accord Jones*, 829 F.3d at 1141; *United States v. Nam Quoc Hoang*, No. 1:16-CR-193, 2017 WL 1197243, at *6 (E.D. Va. Mar. 31, 2017) (holding that when the defendant was questioned immediately about the same crime after invoking his right to remain silent, the defendant's rights were not scrupulously honored).

The government makes much of the fact that Defendant "eagerly *answered questions*, even provided narratives without prompting" after receiving a second *Miranda* warning. Appellee's Br. at 29 (emphasis added). But law enforcement officers do not scrupulously honor a Defendant's unambiguous request to remain silent when those officers unceasingly interrogate Defendant and ignore his clear request to remain silent. As the Ninth Circuit rightly recognized:

> Under *Miranda*, the onus is not on the suspect to be persistent in his demand to remain silent. Rather, the responsibility falls to the law enforcement officers to scrupulously respect his demand. Relying on the fact that it was the defendant, not the interrogators, who continued the discussion, ignores the bedrock principle that the interrogators should have stopped all questioning. A statement taken after the suspect invoked his right to remain silent cannot be other than the product of compulsion, subtle or otherwise.

19

*Jones*, 829 F.3d at 1141 (citations and alterations omitted). Defendant in this case invoked his right to remain silent. Under *Mosley*, all questioning should have ceased. Because Defendant's request was ignored, and questioning continued, Defendant's right was not scrupulously honored, and Defendant's subsequent statements are therefore inadmissible.[1]

### C.

Even though the district court believed the *Weeks* factors supported a finding that Defendant's invocation was not scrupulously honored, the court nevertheless suggested this was "not dispositive because the officer repeated the *Miranda* warning and obtained a waiver from the Defendant . . . ." *Abdallah*, 196 F.Supp.3d at 604. The government likewise argues that Defendant "understood and explicitly waived his rights." Appellee's Br. at 14. These statements improperly conflate the invocation and waiver inquiries.

In *Smith*, the Supreme Court held that waiver and invocation are "entirely distinct inquiries, and the two must not be blurred by merging them together." *Smith*, 469 U.S. at 98. There, the defendant unambiguously invoked the right to counsel. *Id.* Because the defendant invoked his right to counsel, the Supreme Court held that the government could not establish a "valid waiver . . . by showing only that [the defendant] responded to

---

[1] The government similarly argues the exclusionary rule should not apply because suppression "does nothing to advance" the "deterrence of unlawful police activity." Appellee's Br. at 55–56. We disagree. Failing to scrupulously honor the constitutional rights of defendants is precisely the sort of behavior that the exclusionary rule is meant to deter. *See Mosley*, 423 U.S. at 102.

further police-initiated custodial interrogation.'" *Id.* (quoting *Edwards v. Arizona*, 451 U.S. 477, 484 (1981)).

Similarly, once a suspect unambiguously invokes the right to remain silent, all questioning must cease. *Miranda*, 384 U.S. at 444; *see also Jones*, 829 F.3d at 1132. Subsequent statements are inadmissible if the officers continue questioning the suspect. *Mosley*, 423 U.S. at 104. Officers cannot fail to scrupulously honor a suspect's request in the hope that the suspect will subsequently waive that failure. *Cf. United States v. Clark*, 499 F.2d 802, 807 (4th Cir. 1974) ("[O]nce the privilege has been asserted . . . an interrogator must not be permitted to seek its retraction, total or otherwise.") (quoting *United States v. Crisp*, 435 F.2d 354, 357 (7th Cir. 1970)).

Defendant in this case unambiguously invoked his right to remain silent. *See supra* Part II.A. Nevertheless, the officers continued interrogating Defendant and thus failed to scrupulously honor Defendant's invocation. *See supra* Part II.B. Under *Mosley*, Defendant's statements are therefore inadmissible. The officers cannot circumvent *Mosley*'s command by ignoring Defendant's request, continuing to question Defendant, and then using Defendant's subsequent responses to argue he waived his asserted constitutional right.

### D.

The government argues that, even if the district court erred by not suppressing Defendant's statements, the error was harmless. Even though Defendant's confession was inadmissible, we will not reverse a conviction if the error was harmless. *United States v. Colonna*, 511 F.3d 431, 437 (4th Cir. 2007). "In assessing whether a

21

constitutional error was harmless, we determine whether the admission of the statement at issue was harmless beyond a reasonable doubt, such that it is clear that a rational fact finder would have found the defendant guilty absent the error." *United States v. Giddins*, 858 F.3d 870, 885 (4th Cir. 2017) (citations and alterations omitted). The test "is not whether laying aside the erroneously admitted evidence there was other evidence sufficient to convict beyond a reasonable doubt . . ., but more stringently, whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* In conducting this analysis, we are mindful that a "confession is like no other evidence. Indeed, the, defendant's own confession is probably the most probative and damaging evidence that can be admitted against him[.]" *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991); *see also Jones*, 829 F.3d at 1142.

Based upon the facts before us, we cannot say that Defendant's coerced statements were harmless beyond a reasonable doubt on any of the five convicted counts. Indeed, Defendant's confession played an integral role for each conviction.

First, to support Defendant's conspiracy to distribute spice charge, the government introduced Defendant's detailed statements on his relationship with his spice distributor, McMahon. Second, to support Defendant's spice distribution charge, the government introduced Defendant's statements that he sold spice to "pretty much everybody," he "knew spice was illegal under federal law," and he had sold approximately 10,000 grams of spice. Third, to support Defendant's distribution and possession of crack cocaine charge, the government introduced Defendant's statement that he gave prostitutes crack cocaine as a "bonus." Finally, to support Defendant's charges of making false statements

22

to federal Customs, the government introduced Defendant's statements that he successfully hid $150,000 from an additional safe deposit box that the officers were "too late" to seize. By offering Defendant's statements expressing a desire to conceal his money, the government could demonstrate Defendant's consciousness of guilt, destroy Defendant's credibility, and rebut Defendant's claim that he maintained his earnings in cash for religious reasons. *See United States v. Sarwari*, 669 F.3d 401, 407 (4th Cir. 2012) (Where a statement is "susceptible to multiple interpretations, and a defendant's answer is true under one understanding of the question but false under another, the fact finder determines whether the defendant knew his statement was false"); *Hickory v. United States*, 160 U.S. 408, 416 ("It is undoubted that acts of concealment by an accused are competent to go to the jury as tending to establish guilt . . ."). Because of the particularly damaging nature of confessions, and because Defendant's confession was integral to every count that Defendant was convicted of, we cannot say beyond all reasonable doubt that Defendant's coerced statements were harmless as to any count.

III.

Defendant next argues that *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and its progeny required the district court to conduct an *in camera* review before denying his request for production of the email exchange among the law enforcement officers attending Defendant's interrogation, which culminated in the final interrogation report.[2]

---

[2] Having held that the district court erred in denying Defendant's motion to suppress his inculpatory statements, whether the district court erred in denying Defendant's request for *in camera* review is not essential to our disposition of (Continued)

23

"In reviewing the district court's denial of [Defendant]'s *Brady* motion, we review [the district court's] legal conclusions de novo and its factual findings for clear error." *United States v. King*, 628 F.3d 693, 702 (4th Cir. 2011). On review, we agree with Defendant. Specifically, because Defendant demonstrated that the drafting exchange plausibly contained materially favorable evidence, the district court erred in failing to conduct an *in camera* review before denying Defendant's production request.

Under *Brady v. Maryland*, Defendants are entitled to the disclosure of evidence that is "both favorable to the accused and material to guilt or punishment." *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987); *see also Brady v. Maryland*, 373 U.S. at 87. Evidence is favorable "not only when it tends substantively to negate guilt but also when it tends to impeach the credibility of a key witness for the prosecution." *Love v. Johnson*, 57 F.3d 1305, 1313 (4th Cir. 1995). Evidence is material if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995).

In a typical *Brady* case, a defendant has discovered exculpatory evidence after trial, which the defendant alleges the government unconstitutionally suppressed. *King*, 628 F.3d at 702. In these cases, the defendant establishes a *Brady* violation proving the materiality and favorability of the withheld evidence. *Id.* (citing *Kyles*, 514 U.S. at 433). But in some cases, like Defendant's case, the government "may possess potential *Brady*

---

Defendant's appeal. Nonetheless, we exercise our discretion to address the issue so as to provide guidance to other courts presented with similar issues.

material that it deems privileged or that is otherwise confidential." *United States v. Trevino*, 89 F.3d 187, 189 (4th Cir. 1996). Because the defendant does not have access to the confidential material, the defendant "cannot possibly know, but may only suspect, that particular information exists which meets [*Brady*'s] requirements." *Love*, 57 F.3d at 1313. In such cases, "a defendant need only make 'some plausible showing' that exculpatory material exists." *King*, 628 F.3d at 703. To make this showing, the defendant must "identify the requested confidential material with some degree of specificity." *Id.* Specificity ensures that the government's *Brady* obligations do not become "unduly burdensome," *Monroe v. Angelone*, 323 F.3d 286, 316 (4th Cir. 2003), and that the defendant does not conscript the court for "a groundless fishing expedition," *King*, 628 F.3d at 703.

Once the defendant identifies specific evidence that could plausibly be favorable to his defense, the defendant "does not become entitled to direct access to the information to determine for himself its materiality and favorability." *Love*, 57 F.3d at 1313. Rather, the defendant is "entitled, in order to secure the basic right, to have the information he has sufficiently identified submitted to the trial court for *in camera* inspection and a properly reviewable judicial determination made whether any portions meet the [*Brady*] requirements for compulsory disclosure." *Id.* Because the defendant is entitled to *in*

*camera* review, the district court cannot solely "rely on the government's good faith" as a basis to avoid review. *King*, 628 F.3d at 702.[3]

This Court has recognized that an officer's drafting notes must be disclosed under *Brady* when the defendant makes the appropriate "demonstration that the material sought would be exculpatory." *United States v. Crowell*, 586 F.2d 1020, 1029 (4th Cir. 1978). Here, Defendant has identified specific evidence—the drafting exchange—and has made the required demonstration of plausibility. *See Ritchie*, 480 U.S. at 58 n.15.

During the suppression hearing, Defendant sought: (1) to establish that he unequivocally invoked his right to remain silent, and (2) to question when and whether *Miranda* warnings were given by impeaching the officers' credibility. Over the course of the suppression hearing, Defendant highlighted substantial inconsistencies that called into question when those *Miranda* warnings were given. For example, Inspector Sylvester's handwritten notes said, "*Miranda* from DHS form-understood" *and then* Defendant was "not going to say anything at all." J.A. 154. These contemporaneous handwritten notes do not mention Defendant interrupting his *Miranda* warnings.

In contrast, Agent Lewis's final report states that Defendant interrupted halfway through his *Miranda* warnings. Furthermore, Agent Lewis testified during the suppression hearing that there were "some modifications" made over the eight-day drafting period. J.A. 92. Based on Agent Lewis's testimony and these inconsistencies—

---

[3] There may be exceptional circumstances where the district court could rely in part upon the representations of the government. Because the government has not argued this case presents any such circumstances, we need not determine whether, or in what circumstances, such an exception exists.

inconsistencies that could plausibly lead to evidence and arguments materially favorable to Defendant—Defendant requested production of the email exchange.

Together, this evidence was sufficient to meet the "meager" plausibility requirement for *in camera* review. *Love*, 57 F.3d at 1313. Rather than conduct an *in camera* review, the district court denied Defendant's request solely based upon Agent Lewis's representation that there would not be exculpatory information in the officers' emails pertaining to the drafting of the report. Relying upon this representation was error. *King*, 628 F.3d at 702.

The district court's error was even clearer at the time of Defendant's motion to reconsider production. There, Defendant demonstrated additional substantial inconsistencies between Agent Lewis's suppression hearing testimony, grand jury testimony, and final typewritten report. For example, Agent Lewis testified at the suppression hearing that he did not use a written waiver because Defendant was "moving a mile a minute" and he "did not want to stifle" Defendant's statements. J.A. 101–02. But Agent Lewis testified before the grand jury that Defendant waived his *Miranda* rights "both orally and in writing" prior to the interrogation. J.A. 1256. Furthermore, Agent Lewis told the grand jury that Defendant "started off slow" after receiving his *Miranda* warnings. J.A. 1264. And Agent Lewis did not tell the grand jury that Defendant interrupted his *Miranda* warnings at all.

We recognize that the requested emails "may contain nothing helpful to" the Defendant. *King*, 628 F.3d at 703. But as was previously discussed, Defendant's confession contributed to each count for which the jury convicted Defendant. It was

27

critical for Defendant's "entire defense" to establish that he unambiguously invoked the right to remain silent and to impeach the officers' credibility on the nature and timing of the *Miranda* warnings. *Id.* at 704. Based upon: (1) the inconsistencies that existed between Inspector Sylvester's contemporaneous handwritten notes and Agent Lewis's final report, (2) the inconsistencies in Agent Lewis's grand jury testimony and suppression hearing testimony, and (3) Agent Lewis's own testimony that there were "some modifications" over the course of the drafting exchange, it is plausible that an *in camera* review of the specific drafting exchange would reveal evidence that was materially favorable to Defendant's challenge of when *Miranda* warnings were given. The district court thus erred in failing to conduct an *in camera* review.

## IV.

Defendant raises several additional arguments on appeal. For reasons briefly discussed below, each of these arguments are without merit.

## A.

Defendant first contends that the district court erred by limiting non-party witnesses' testimony on whether *they* believed—not whether *Defendant* believed—that spice was illegal. We review "a trial court's rulings on the admissibility of evidence for abuse of discretion" and "will only overturn an evidentiary ruling that is arbitrary and irrational." *United States v. Cole*, 631 F.3d 146, 153 (4th Cir. 2011). Trial courts have "wide latitude" to "place limitations upon the cross-examination of witnesses . . . based on concerns including harassment, prejudice, confusion of the issues, repetition, or marginal relevance." *United States v. Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014)

28

(citations and alterations omitted). Furthermore, we "rarely reverse relevancy decisions because they are fundamentally a matter of trial management." *Id.* (citations omitted). Under this deferential standard of review, the district court did not abuse its discretion by excluding non-party witnesses' testimony on whether they believed spice was illegal.

In *Zayyad*, the defendant sought to cross-examine non-party witnesses on their knowledge of the "gray market" to show that the defendant "reasonably believed that he dispensed real [as opposed to counterfeit] drugs." *Id.* at 458. The district court excluded this testimony, finding the witnesses' knowledge of the gray market was not relevant to the defendant's *mens rea*. *Id.* at 459 (citing Fed. R. Evid. 402 ("Irrelevant evidence is not admissible")). This Court affirmed. We explained that absent some showing that the defendant relied on the witnesses' belief, the district court reasonably determined that this testimony was merely a distraction, having "no connection to the knowledge element [of the crime] and consequently no relevance." *Id.* at 460–61.

As in *Zayyad*, the district court did not abuse its discretion in excluding the testimony of non-party witnesses regarding their knowledge of the illegality of spice. Defendant did not establish any connection between the witnesses' knowledge and Defendant's own *mens rea* at trial. Without this connection, the district court could reasonably determine that the witnesses' knowledge would confuse the jury as to the critical issue it was tasked with deciding—whether *Defendant* knew spice was illegal. Therefore, the district court did not abuse its discretion in limiting the non-party witnesses' testimony.

B.

29

Defendant also challenges the district court's reliance on Agent Lewis's conflicting testimony in denying Defendant's motion to suppress. According to Defendant, the district court "should have considered the conflicting testimony of Special Agent Lewis [and therefore] granted the motion for reconsideration." Appellant's Br. at 17. But even when there are "serious questions about the credibility of some of the government's witnesses . . . it is for the [factfinder] and not the appellate court to weigh the evidence and judge the credibility of the witnesses." *United States v. Wilson*, 118 F.3d 228, 236 (4th Cir. 1997). Unlike the appellate court, the factfinder has "the opportunity to observe the witnesses, listen to their testimony, and [is] in the best position to make the credibility finding." *See United States v. Dagnan*, 293 F. App'x 205, 207 (4th Cir. 2008) (unpublished opinion). Despite the inconsistencies which existed among Agent Lewis's grand jury testimony, suppression hearing testimony, and in the final typewritten report, it was ultimately for the district court to observe Agent Lewis and weigh the credibility of testimony at the hearing. Defendant has presented no evidence to suggest that the district court failed to meet its obligation, and there is no basis for us to conclude the district court erred in crediting Agent Lewis's testimony. *See United States v. Friedemann*, 210 F.3d 227, 230 (4th Cir. 2000).

C.

Defendant next argues that the prosecutor improperly relied upon what he views as the misleading testimony of Inspector Sylvester in its closing argument, and that the district court erred by failing to cure this improper argument. Defendant did not raise this argument below. When, as here, a defendant fails to object to an improper closing

30

argument at trial, this Court's review is limited to plain error. *United States v. Hale*, 857 F.3d 158, 171 (4th Cir. 2017). Under this circumscribed standard of review, we reject Defendant's argument.

Improper closing arguments by a prosecutor "may so infect the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Lighty*, 616 F.3d 321 (4th Cir. 2010) (citations and alterations omitted). To determine whether a prosecutor's argument violated a defendant's due process rights, this Court examines: "(1) whether the remarks were, in fact, improper, and, (2) if so, whether the improper remarks so prejudiced the defendant's substantial rights that the defendant was denied a fair trial." *Id.* In the context of using false testimony, prosecutorial misconduct occurs "not only where the prosecution uses perjured testimony to support its case, but also where it uses evidence which it knows creates a false impression of a material fact." *Hamric v. Bailey*, 386 F.2d 390, 394 (4th Cir. 1967); *see also United States v. Cargill*, 17 F. App'x 214, 224 (4th Cir. 2001) (unpublished opinion).

The Analogue Act renders it a crime to knowingly distribute a controlled substance. 18 U.S.C. § 841(a)(1). In *McFadden v. United States*, the Supreme Court provided two methods by which the knowledge element may be satisfied: (1) by "showing that the defendant knew he possessed a substance listed on the [federal drug] schedules," and (2) by showing that the defendant "knew the identity of the substance possessed." 135 S. Ct. 2298, 2304 (2015). Under the second method, "ignorance of the law is typically no defense[.]" *Id.*

During Defendant's custodial interrogation, Defendant stated that he believed spice was "'legal in Virginia" but "not for the feds." J.A. 147. At trial, Inspector Sylvester did not mention that Defendant thought spice was legal in Virginia. Instead, Inspector Sylvester testified that Defendant's "understanding was that [spice] was illegal under federal law." J.A. 343. Defendant did not object, but Defendant did cross-examine Sylvester using the full statement. During closing arguments, the prosecutor reemphasized that Defendant "told agents [spice] was illegal." J.A. 1148.

Defendant argues that district court plainly erred because Inspector Sylvester's statements were misleading testimony, and it was thus improper for the prosecutor to rely on them. We disagree. First, Inspector Sylvester's statement was literally true. Defendant had in fact stated that spice was illegal under federal law. Though Inspector Sylvester omitted Defendant's statement that spice was "legal in Virginia," this omission is immaterial to the knowledge element of the Analogue Act, 18 U.S.C. § 841(a)(1). To the extent that the government sought to prove Defendant's knowledge under the first *McFadden* method, it is simply irrelevant whether Defendant believed spice was legal under *Virginia* law. Instead, what is relevant is that Defendant knew spice was listed on the *federal* drug schedules. To the extent that the government sought to prove knowledge under the second *McFadden* method, all that is pertinent is that Defendant knew the identity of the controlled substance. Because Inspector Sylvester's testimony was

32

literally true, and any omission was immaterial, the district court did not plainly err in failing to take corrective action.[4]

V.

In sum, the district court improperly denied Defendant's motions to suppress and to reconsider suppression. Additionally, the district court erred by failing to conduct an *in camera* review before denying Defendant's motions to produce and to reconsider production. For these reasons, we reverse Defendant's conviction on all five counts. As such, this case is remanded for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

---

[4] Defendant also argues that the district court erred by failing to grant his Rule 29 motion for acquittal. Because we vacate Defendant's conviction, we decline to address this argument.