*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellee,

v

RANDY JAMES MAHAFFEY,

   Defendant-Appellant.

UNPUBLISHED
December 26, 2019

No. 341267
Macomb Circuit Court
LC No. 2017-000870-FC

PEOPLE OF THE STATE OF MICHIGAN,

   Plaintiff-Appellee,

v

CHRISTOPHER RASHAWN JONES,

   Defendant-Appellant.

No. 342112
Macomb Circuit Court
LC No. 2017-000869-FC

Before: RIORDAN, P.J., and JANSEN and STEPHENS, JJ.

PER CURIAM.

In Docket No. 341267, defendant Randy James Mahaffey appeals as of right his jury trial conviction of armed robbery, MCL 750.529, for which the trial court sentenced him as a fourth-offense habitual offender, MCL 769.12, to 420 to 700 months in prison. In Docket No. 342112, defendant Christopher Rashawn Jones appeals as of right his jury trial convictions of first-degree felony murder, MCL 750.316(1)(b), armed robbery, felon in possession of a firearm, MCL 750.224f, and possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced Jones to life in prison without parole for the felony-murder conviction, and concurrent prison terms of 30 to 46 years for the armed robbery conviction, and 5 to 10 years for the felon-in-possession conviction, to be served consecutive to a two-year term of imprisonment for the felony-firearm conviction. We affirm in both appeals.

-1-

Defendants' convictions arise from the robbery and shooting death of James Capizzo outside an apartment building in Mount Clemens during the early morning hours of December 26, 2016. The prosecutor's theory of the case was that defendants Mahaffey and Jones acted in concert to rob Capizzo of some Vicodin pills, and that Jones shot and killed Capizzo during the offense. Defendants were tried separately. Mahaffey's theory of defense was that he was merely present when the robbery and shooting was committed solely by Jones. Jones's theory of defense was that he intended to sell his gun to Mahaffey and that the gun, which firearms experts agreed was in poor condition, accidently discharged during the transfer, killing Capizzo. Jones argued that Mahaffey was solely responsible for any robbery, and that Jones was guilty, at worst, of only involuntary manslaughter.

## I. DOCKET NO. 341267 (DEFENDANT MAHAFFEY)

### A. SUFFICIENCY OF THE EVIDENCE

Mahaffey's first claim on appeal is that there was insufficient evidence to support his conviction of armed robbery, and that the trial court should have granted his motion for a directed verdict. We disagree.

We review de novo a challenge to the sufficiency of the evidence in support of a criminal conviction and a trial court's denial of a motion for a directed verdict. *People v McKewen*, 326 Mich App 342, 347; 926 NW2d 888 (2018). In reviewing a challenge to the sufficiency of the evidence, we must view the evidence in the light most favorable to the prosecution to determine whether the trier of fact could have found that the essential elements of the crime were proved beyond a reasonable doubt. *People v Chelmicki*, 305 Mich App 58, 64; 850 NW2d 612 (2014); *People v Harverson*, 291 Mich App 171, 175; 804 NW2d 757 (2010). "All conflicts with regard to the evidence must be resolved in favor of the prosecution." *People v Wilkens*, 267 Mich App 728, 738; 705 NW2d 728 (2005). This Court reviews a challenge to the trial court's ruling on a motion for a directed verdict in the same manner as a challenge regarding the sufficiency of the evidence, except that only the evidence presented by the prosecution is considered. *People v Aldrich*, 246 Mich App 101, 122; 631 NW2d 67 (2001).

To prove the elements of armed robbery, a prosecutor must show that: "(1) the defendant, in the course of committing a larceny of any money or other property that may be the subject of a larceny, used force or violence against any person who was present or assaulted or put the person in fear, and (2) the defendant, in the course of committing the larceny, either possessed a dangerous weapon, possessed an article used or fashioned in a manner to lead any person present to reasonably believe that the article was a dangerous weapon, or represented orally or otherwise that he or she was in possession of a dangerous weapon." *People v Chambers*, 277 Mich App 1, 7; 742 NW2d 610 (2007). MCL 750.530(2) defines "in the course of committing a larceny" to include "acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property."

The prosecution's theory at trial was that Mahaffey was guilty under an aiding or abetting theory. The elements necessary to convict a defendant under an aiding or abetting theory are:

(1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*People v Plunkett*, 485 Mich 50, 61; 780 NW2d 280 (2010) (citations and quotation marks omitted).]

"An aider and abettor's state of mind may be inferred from all the facts and circumstances." *People v Carines*, 460 Mich 750, 758; 597 NW2d 130 (1999) (internal quotation omitted).

There was ample evidence that a robbery was committed. The evidence of the crime came from Mahaffey. According to Mahaffey's own testimony, Jones pointed a rifle at Capizzo and demanded that Capizzo "give him the f**king pills." He testified that Jones fired the rifle above Capizzo's head and Capizzo threw the pills on the ground and ran down some stairs. In both his police interview and at trial, Mahaffey stated that Jones picked up the pills and ran. The police found only one pill remaining on the step when they responded to the scene.

A reasonable trier of fact could also conclude that the second element of aiding or abetting was met because evidence was presented at trial to establish that Mahaffey performed acts that assisted or encouraged the commission of the robbery. Mahaffey argues that the evidence showed that he was merely present during the robbery, which is insufficient to establish aiding or abetting. However, the support for this element arises from a combination of the contents of certain texts between Jones and Mahaffey, the deletion of contemporaneous texts from Mahaffey's phone and admissions from Mahaffey, himself. First, there is record evidence that Mahaffey and Jones communicated with phone calls and text messages throughout the night leading up to the robbery. The subject of several of the texts that were retrieved concerned exchanges and purchases of crack cocaine from Jones for money and Vicodin. There was testimony that Mahaffey, Jones and Herman consumed drugs throughout the evening of the crime. After the first supply of cocaine was consumed, Mahaffey drove with Capizzo to get Capizzo's wife's pills. Mahaffey and Jones exchanged texts regarding exchanging Capizzo's supply of Vicodin for more crack.

Mahaffey admitted that he called Jones and informed him that Capizzo still had more Vicodin. Jones texted Mahaffey, "Okay. I'm coming for the pills." Jones also asked, "Are we gonna share the pros?" The later text was not explained by any witness. Additionally, there was testimony that the content of 10 text messages generated during this time period were not retrieved from Mahaffey's phone. Mahaffey argues that the absence of an explanation of the "pros" text and the weakness of the expert testimony on the geographic origin and content of the texts abrogate any inference that he was anything other than merely present. To the contrary, the totality of the evidence supports an inference that the messages were deleted by Mahaffey and that Jones and Mahaffey were acting in concert pursuant to a plan to rob Capizzo of his pills and share the proceeds.

Finally, the third element of aiding and abetting was met because there was sufficient evidence to show that Mahaffey intended the armed robbery or participated while knowing that Jones possessed the requisite intent. According to Mahaffey, Capizzo felt "suspicious" in Mahaffey's friend, Susan Hemmen's, apartment before the robbery. As a result, Mahaffey

-3-

accompanied him outside where Jones was waiting to commit the crime. After the shooting, Mahaffey did not stay to help his friend, who had been shot. Instead, Mahaffey retrieved his vest because it was identifiable to the police and fled to the shooter's home. According to Jones's fiancée, Ashley Redmond, when Mahaffey arrived, he did not appear nervous or upset. Mahaffey and Jones then traveled together going to several places in Detroit. While Mahaffey argues that he feared Jones and was an unwilling passenger, the jury could infer consciousness of guilt from his flight and infer that he intended the armed robbery or had the requisite knowledge of Jones's intent. *People v Unger*, 278 Mich App 210, 226; 749 NW2d 272 (2008).

Although Mahaffey suggests innocent explanations for the communications and other evidence, " 'the prosecution need not disprove all theories consistent with defendant's innocence; it need only introduce sufficient evidence to convince a reasonable jury of its theory of guilt despite the contradictory theory or evidence a defendant may offer.' " *People v James*, 327 Mich App 79, 87; 932 NW2d 248 (2019), quoting *People v Solmonson*, 261 Mich App 657, 662-663; 683 NW2d 761 (2004).

Mahaffey also argues that the trial court erred by denying his motion for a directed verdict. Mahaffey's primary argument at trial was that there was no evidence of a taking on the record at the close of the prosecution's case. He notes on appeal that the prosecutor relied on Jones's statements to the police that he picked up the pills after the shooting, but those statements were not admitted into evidence. Mahaffey is correct that Jones's statements to the police were not admitted into evidence at Mahaffey's trial. Therefore, it was improper for the prosecutor to rely on those statements when opposing the motion for a directed verdict outside the presence of the jury. However, Mahaffey's police interview had been played for the jury. In that interview, Mahaffey stated that Jones picked up "all the pills" after firing the shots. Because Mahaffey's own interview statements, which were admissible under MRE 801(d)(2), established a taking, the trial court did not err by submitting the charge to the jury.

## B. "SUICIDE BY COP" EVIDENCE

Mahaffey next argues that the trial court erred by admitting into evidence a short portion of his interrogation when he was asked if he pleaded with the police at the bar to shoot him. Mahaffey argues that the evidence was not relevant under MRE 402, it was more prejudicial than probative under MRE 403, and its admission did not support an inference of consciousness of guilt. We disagree.

At trial, before Mahaffey's police interview was introduced, Mahaffey's attorney objected to the admission of the portion of the interview containing questioning about "suicide by cop." He argued that it was not relevant because Mahaffey was highly intoxicated and was speaking to the police regarding a separate incident. He did not make any argument regarding hearsay. The prosecutor responded that Mahaffey's suicidal ideation demonstrated consciousness of guilt. When the trial court asked what Mahaffey stated in response to the question whether he remembered telling the police to shoot him, the prosecutor replied that he could not remember without reviewing the recorded interview. The trial court ultimately ruled that the evidence was admissible.

Defense counsel never specifically made the argument, which Mahaffey now makes on appeal, that the challenged questioning did not actually reveal evidence of suicidal ideation. Therefore, we conclude that this argument is unpreserved. *Aldrich*, 246 Mich App at 113 (to preserve an evidentiary issue for appeal, the party opposing the admission of the evidence must object at trial and specify the same ground for the objection on appeal); see also *People v Kimble*, 470 Mich 305, 309; 684 NW2d 669 (2004) ("An objection based on one ground is usually considered insufficient to preserve an appellate attack based on a different ground."). "Unpreserved claims of evidentiary error are reviewed for plain error affecting the defendant's substantial rights." *People v Benton*, 294 Mich App 191, 202; 817 NW2d 599 (2011).

Generally, "[a]ll relevant evidence is admissible" and "[e]vidence which is not relevant is not admissible." MRE 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. MRE 403 provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In *United States v Cody*, 498 F3d 582, 591-592 (CA 6, 2007),[1] the Sixth Circuit Court of Appeals explained that "long-accepted rules of evidence . . . treat suicide as a form of flight," which constitutes circumstantial evidence of consciousness of guilt. The court employed a four-step analysis to determine the probative value of the flight:

> [T]he probative value of flight evidence depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged. [*Id.* at 591, quoting *United States v Atchley*, 474 F3d 840, 853 (CA 6, 2007).]

The court held "that suicidal ideations and/or attempts may be admissible as relevant evidence of consciousness of guilt, but only after being screened through typical Rule 403 balancing in accordance with this court's jurisprudence on the admissibility of flight evidence." *Id.* at 592.

The defendant in *Cody* stated in a police interview that he had "considered suicide as an alternative to going to prison for what he has done." The court concluded that the statement "ranks fairly high" under the four-step analysis because " 'for what he has done' . . . could reasonably be interpreted to satisfy the fourth inference: 'from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.' " Moreover, the defendant in *Cody* could not establish unfair prejudice. He claimed that there was a risk that the jury would conclude that he was "psychologically impaired," but the court concluded that sympathy for him was just as likely as prejudice against him. Therefore, admission of the evidence of the defendant's suicidal ideation was not an abuse of discretion.

---

[1] "Although lower federal court decisions may be persuasive, they are not binding on state courts." *Abela v Gen Motors Corp*, 469 Mich 603, 607; 677 NW2d 325 (2004).

To the extent that Mahaffey told the police to shoot him and was therefore experiencing suicidal thoughts after the armed robbery and Capizzo's shooting, this evidence was arguably relevant to flight under *Cody*. MRE 401.

Even if the admission of the interview was erroneous, it was not a plain error affecting his substantial right because when the recorded interview was later played, it showed that Mahaffey denied remembering telling the police to shoot him. Mahaffey's statements in the interview were admissible at trial under MRE 801(d)(2). Given that Mahaffey denied having remembered telling the police to shoot him, the evidence weighed against any suicidal ideation and moved the needle away from evidence of consciousness of guilt, arguably helping Mahaffey's case. Finally, any inference of consciousness of guilt arising from the interview was cumulative of other similar facts showing his guilty conscious.

## C. MOTION TO SUPPRESS MAHAFFEY'S POLICE STATEMENTS

Mahaffey further argues that the trial court erred by denying his motion to suppress his custodial statements to the police. He contends that the statements were improperly obtained after he invoked his right to remain silent. We disagree.

The trial court denied Mahaffey's motion to suppress after conducting a *Walker*[2] hearing. We review the trial court's findings of fact for clear error, but review the court's ultimate decision de novo. *People v Smart*, 304 Mich App 244, 247; 850 NW2d 579 (2014). A finding is clearly erroneous if it leaves this Court with the "definite and firm conviction that the trial court made a mistake." *People v Manning*, 243 Mich App 615, 620; 624 NW2d 746 (2000).

"The United States Constitution and the Michigan Constitution both prohibit 'compelled' self-incrimination." *People v Elliott*, 494 Mich 292, 300, 301 n 4; 833 NW2d 284 (2013), quoting US Const, Am V; Const 1963, art 1, § 17.

> "A criminal defendant enjoys safeguards against involuntary self-incrimination during custodial interrogations. Included within these safeguards is the right to remain silent during custodial interrogation and the right to cut off police questioning. A defendant may assert his or her right to remain silent at any time, however, the assertion must be unequivocal." [*People v Henry* (*After Remand*), 305 Mich App 127, 145; 854 NW2d 114 (2014).]

"When a defendant invokes his or her right to remain silent, the police must 'scrupulously honor' the defendant's request." *Id.*, quoting *Michigan v Mosley*, 423 US 96, 103-104; 96 S Ct 321; 46 L Ed 2d 313 (1975) (quotation marks omitted). "The police fail to scrupulously honor a defendant's invocation of the Fifth Amendment right by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Henry*, 305 Mich App at 145 (quotation marks and citation omitted). In *Miranda v Arizona*, 384 US 436, 473-474; 86 S Ct 1602; 16 L Ed 2d 694 (1966), the Supreme Court stated:

---

[2] *People v Walker* (*On Rehearing*), 374 Mich 331, 338; 132 NW2d 87 (1965).

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

In *Rhode Island v Innis*, 446 US 291, 301; 100 S Ct 1682; 64 L Ed 2d 297 (1980), the Supreme Court explained the term "interrogation" under *Miranda*, which

> refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation.

"Although the police may terminate an interrogation without falling into total silence, any discussion with the suspect other than that "relating to routine incidents of the custodial relationship" must be considered a continuation of the interrogation." *Christopher v Florida*, 824 F2d 836, 845-846 (CA 11, 1987).

### 1. WHETHER THE DETECTIVES SCRUPULOUSLY HONORED MAHAFFEY'S INVOCATION OF THE RIGHT TO REMAIN SILENT AT HIS FIRST INTERVIEW?

The trial court admitted Mahaffey's statements given during a second police interview. The first interview ended after Mahaffey invoked his right to remain silent. We first address whether the police scrupulously honored Mahaffey's invocation of his right to remain silent at the first interview.

In *People v White*, 493 Mich 187; 828 NW2d 329 (2013), the Supreme Court addressed what it characterized as a close question. In that case, after the defendant invoked his *Miranda* rights, the officer stated that he was " 'not asking you questions, I'm just telling you,' " and, " 'I hope that the gun is in a place where nobody can get a hold of it and nobody else can get hurt by it, okay. All right.' " *Id*. at 191. The defendant interrupted the officer's comments and blurted out, among other incriminating statements, " 'I didn't even mean for it to happen like that. It was a complete accident.' " *Id*. at 192.

In *White*, our Supreme Court held that the defendant was not subjected to "interrogation." *Id*. at 209. The court analyzed both whether the defendant had been subjected to "express questioning" and whether he had been subjected to its "functional equivalent." *Id*. at 197-198. The Court concluded that there had been no "express questioning" for several reasons. First, the officer's comment "was not a question because it did not ask for an answer or invite a response. It was a mere expression of hope and concern." *Id*. at 198. Second, "the officer's addition of the

words 'okay' and 'all right' at the end of his comment did not transform a non-question into a question." *Id*. Third, the officer prefaced his comment with " 'I'm not asking you questions . . . .' " *Id*. at 199. Fourth, the fact that the defendant's response—claiming the occurrence was an accident—was not related to the officer's preceding comment (regarding the location of the gun) "reinforces the conclusion that the officer's comment here was not a question." *Id*. at 200. Fifth, the fact that the officer responded to the defendant's incriminating statement by attempting to "veer the conversation away from any further incriminating statements" serves to "underscore[ ] that the officer's comment was not 'designed to elicit an incriminating response . . . .' " *Id*. at 200-201. Finally, "to the extent that the officer's statement can even be reasonably viewed as a question, this particular question does not seem intended to generate an incriminating response. Instead, if anything, the officer was simply trying to ensure that defendant heard and understood him." *Id.* at 201-202.

The Court additionally held that the defendant "was not subjected to the 'functional equivalent' of express questioning after he invoked his right to remain silent." *Id*. at 202. Noting that "direct statements to the defendant do not necessarily constitute 'interrogation,' " the Court stressed that "the dispositive question is whether the 'suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response.' " *Id*. at 208 (citation omitted).

In *United States v Abdallah*, 911 F3d 201, 207 (CA 4, 2018), the police started an interrogation by reading the defendant his *Miranda* rights. The defendant purportedly interrupted "approximately halfway" through to inform the officers that he "wasn't going to say anything at all." An agent responded by stating, "Well, just let me finish your Warning first." Immediately after the warning, the agent asked, "Do you even know why you're under arrest[?]" The defendant responded, "No, tell me." The agent then repeated the *Miranda* warning. This time, the defendant did not interrupt, and afterward he indicated that he understood his rights and made multiple inculpatory statements. *Id*. The court noted that the agent's question about the reason the defendant was under arrest "reasonably required him to discuss his substantive offense." *Id.* at 215. Given that the defendant clearly invoked his right to remain silent and all questioning should have ceased, the agent did not scrupulously honor his request and the following statements were not admissible. *Id.*

In this case, the video recording of Mahaffey's first interview demonstrates that he unequivocally invoked his right to silence by stating, "[S]omething like this . . . I ain't saying nothing." Thereafter, Detective Greg Shell urged Mahaffey to talk if he "didn't do it." Mahaffey again asserted his right to silence, but Detective Shell referenced his potential punishment for murder and said "the only thing that talking would do would help." Unlike the officer's statement in *White* about the gun, which was only an expression of concern and did not ask for an answer or invite a response, here, Detective Shell repeatedly urged Mahaffey to talk to help his situation. Detective Shell's comments are more similar to the agent's statements in *Abdallah*, which invited an incriminating response. Therefore, we conclude that the trial court erred when it ruled that the detectives scrupulously honored Mahaffey's initial request to remain silent at the initial interview.

## 2. THE EFFECT OF MAHAFFEY'S RE-INITIATION OF THE INTERROGATION AFTER THE OFFICERS FAILED TO SCRUPULOUSLY HONOR HIS REQUEST TO REMAIN SILENT AT THE FIRST INTERVIEW

An invocation of the right to remain silent does not mean that questioning can never be resumed, see *Mosley*, 423 US at 104-105, nor does it mean that a defendant cannot later waive the right to remain silent, see *North Carolina v Butler*, 441 US 369, 374-375; 99 S Ct 1755; 60 L Ed 2d 286 (1979). "[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his right to cut off questioning was scrupulously honored." *Mosley*, 423 US at 104 (quotation marks omitted). The police may reinitiate a discussion with a suspect who has invoked the right to remain silent if a significant period of time has elapsed and if the police have readvised the suspect of his or her rights. *Id.* at 106-107.

In *Mosley*, the defendant was arrested, advised of his rights under *Miranda*, and questioned regarding several robberies. He invoked his right to silence by stating that he did not want to answer any questions about the robberies. *Id.* at 97. Two hours later, a different detective gave him separate *Miranda* warnings and questioned him about an unrelated murder and attempted "holdup." *Id.* at 97-98. The defendant then made statements implicating himself in the murder. *Id.* There was no claim that any procedure involving the second interrogation, "standing alone, did not fully comply with the strictures of the *Miranda* opinion." Instead, the defendant argued that, under *Miranda*, it was constitutionally impermissible for the detective to question him about the murder after he had told the previous detective that he did not want to answer any questions about the robberies. *Id.* at 99.

The Supreme Court cited language from *Miranda*, which required further exploration because its literal meaning would lead to "absurd and unintended results." The Court observed that a passage from *Miranda* "states that 'the interrogation must cease' when the person in custody indicates that 'he wishes to remain silent.' It does not state under what circumstances, if any, a resumption of questioning is permissible." *Id.* at 101-102. The Court reasoned that "[t]he critical safeguard identified in the passage at issue is a person's 'right to cut off questioning.' Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Id.* at 103-104 (citation to *Miranda* omitted). Because the police in *Mosley* "immediately ceased the interrogation, resumed questioning only after the passage of a significant period of time and the provision of a fresh set of warnings, and restricted the second interrogation to a crime that had not been a subject of the earlier interrogation," the admission of the defendant's incriminating statement did not violate the principles of *Miranda*.

In *United States v Rieves*, 584 F2d 740, 743-744 (CA 5, 1978), the suspect was arrested at approximately 5:45 p.m., and advised of his *Miranda* rights. The suspect denied knowing a suspected accomplice and invoked the right to counsel. The agent asked no further questions, but walked in and out of the office where the suspect was detained several times during the next few hours. The agent also told the suspect that any cooperation would be made known to the court at the time of sentencing. At 8:30 p.m., the suspect asked to speak to the agent. He then said that the accomplice was not involved, gave an oral statement, and made an extensive written statement. *Id.* The Fifth Circuit concluded:

These comments, however, constituted neither interrogation nor coercion. [The suspect] admitted that his rights had been read to him and that he understood them. When he reinitiated unprompted by further interrogation the dialogue with [the agent], he affirmatively demonstrated that he wished to waive his right to remain silent. [*Id.* at 745.]

In this case, although the police did not scrupulously honor Mahaffey's request to remain silent in the first interview, that interview ceased less than two minutes after Mahaffey's invocation and no inculpatory information was received. Similar to the two interviews in *Mosley*, two hours separated Mahaffey's first and second interviews. Moreover, like the defendant in *Rieves*, it was Mahaffey who sought out the detective to restart the discussions in this case.

Mahaffey relies on the threat of the pending murder charge mentioned by Detective Bell after he invoked his right to silence to render the second interview contents inadmissible. However, Mahaffey knew about the murder charge even before he asserted that right and before Detective Bell made any statements. In fact, he based the invocation of his right to silence on the seriousness of the charge. Moreover, at the *Walker* hearing, Mahaffey made no reference to Detective Bell's statements and instead maintained that the first interview stopped when he asserted his rights. This testimony demonstrates that Mahaffey believed that he had enjoyed the critical "right to cut off questioning" under *Miranda. Mosley*, 423 US at 103-104. Further supporting the conclusion that Mahaffey believed he was in control of the questioning, Mahaffey testified at the *Walker* hearing that he initiated the second interview on his "own volition" and nobody "forced" him. Mahaffey was given the full *Miranda* warnings again at the second interview. Given this record, the trial court did not err when it concluded that the detectives did not fail to scrupulously honor Mahaffey's previous request to remain silent by allowing Mahaffey to initiate a second interview.

### 3. WAS MAHAFFEY'S WAIVER OF RIGHTS AT THE SECOND INTERVIEW VOLUNTARY, KNOWING, AND INTELLIGENT?

Mahaffey also challenges the admissibility of his statements during the second interview on the basis that his waiver of rights was not voluntary or knowingly and intelligently made.

In *People v Tanner*, 496 Mich 199, 206-209; 853 NW2d 653 (2014), our Supreme Court explained:

[W]hen a suspect has been afforded *Miranda* warnings and affirmatively waives his *Miranda* rights, subsequent incriminating statements may be used against him. *Miranda*, 384 US at 444, 479. A suspect's waiver of his *Miranda* rights must be made "voluntarily, knowingly, and intelligently." The United States Supreme Court has articulated a two-part inquiry to determine whether a waiver is valid:

First, the relinquishment of the right must have been "voluntary," in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the

-10-

consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. [Citations omitted.]

### a. VOLUNTARINESS

Whether a waiver is voluntary is dependent on the absence of police coercion. *People v Eliason*, 300 Mich App 293, 304; 833 NW2d 357 (2013), remanded on other grounds 496 Mich 440 (2014). Again, the defendant must waive his or her rights by his or "her own 'free and deliberate choice,' " not through intimidation. *Id.*

> A court should consider factors such as: the duration of the defendant's detention and questioning; the age, education, intelligence, and experience of the defendant; whether there was unnecessary delay of the arraignment; the defendant's mental and physical state; whether the defendant was threatened or abused; and any promises of leniency. [*People v Gipson*, 287 Mich App 261, 265; 787 NW2d 126 (2010).]

The trial court found that Mahaffey demonstrated careful deliberation with regard to his rights. The trial court noted that, in the first interview, Mahaffey insisted that the detective advised him of the full *Miranda* warnings. Moreover, Mahaffey initially invoked his right to silence because of his consideration of the seriousness of the charge, despite Detective Bell's statements encouraging him to do otherwise. The first interview was less than five minutes long, and two hours elapsed before Mahaffey initiated the second interview. The second interview began with a new reading of the *Miranda* warnings and lasted less than an hour. Mahaffey insisted that the decision to reach out to the detective was made on his "own volition" and nobody "forced" him.

The trial court found that Mahaffey, 27 years old, was "by no means . . . a naïve teenager or even young adult." The court cited Mahaffey's "extensive experience with the criminal justice system," including two prior felony convictions, seven misdemeanors, and four juvenile adjudications. The trial court noted that Mahaffey had been hospitalized for the overconsumption of alcohol the night before, but was "in good enough condition to be released." The court, after observation of the recording, found that Mahaffey did not slur his words or show any signs of intoxication during the interview. The court noted that he was "somewhat lethargic," but also alert and oriented, that his answers were appropriate and responsive to the detectives' questions. Thus, the trial court did not err when it found that the factors weighed heavily in favor of Mahaffey's waiver being voluntary.

### b. KNOWING AND INTELLIGENT

"Whether a waiver is knowing and intelligent 'requires an inquiry into [a] defendant's level of understanding, irrespective of police conduct.' " *Eliason*, 300 Mich App at 304, quoting *People v Gibson*, 287 Mich App 261, 265; 787 NW2d 126 (2010). A knowing waiver of *Miranda* rights does not require that the suspect understand the ramifications and consequences of choosing to exercise or waive those rights that the police have properly explained to him or

her. *People v Abraham*, 234 Mich App 640, 644; 599 NW2d 736 (1999), citing *People v Cheatham*, 453 Mich 1, 28; 551 NW2d 355 (1996). Rather, a minimal level of understanding— whether the defendant understood that he or she did not have to speak, that he or she had the right to the presence of counsel, and that the state could use what he or she said in a later trial against him or her—is all that is required for a valid waiver. *Abraham*, 234 Mich App at 642, 653-654.

Again, the trial court relied on Mahaffey's caution and deliberation between the first and second interviews. The court also again cited Mahaffey's request to hear the *Miranda* warnings in full so that he could assess them. Moreover, the court acknowledged Mahaffey's understanding of the seriousness of the charge and the potential effect of making a statement based on his initial invocation of the right to silence. The trial court did not err by concluding that Mahaffey's statement was knowing and intelligent.

For these reasons, we hold that the trial court did not err by denying Mahaffey's motion to suppress.

## D. PROSECUTOR'S CONDUCT

Mahaffey argues that improper arguments by the prosecutor during closing argument denied him a fair trial. He argues: (1) the prosecutor improperly argued that Mahaffey asked the police to shoot him, and (2) the prosecutor improperly argued that Mahaffey deleted 10 missing text messages. Because there was no objection to the challenged arguments at trial, these claims are unpreserved. *People v Abraham,* 256 Mich App 265, 274, 662 NW2d 836 (2003). We review unpreserved claims of prosecutorial misconduct for plain error affecting substantial rights. *People v Vandenberg*, 307 Mich App 57, 61; 859 NW2d 229 (2014). An error is plain if it is clear or obvious, and an error affects substantial rights if it is prejudicial, i.e., if it affects the outcome of the proceedings. *People v Jones*, 468 Mich 345, 355; 662 NW2d 376 (2003). "Reversal is warranted only when plain error resulted in the conviction of an actually innocent defendant or seriously affected the fairness, integrity, or public reputation of judicial proceedings, independent of defendant's innocence." *People v Ackerman,* 257 Mich App 434, 448-449; 669 NW2d 818 (2003). Reversal is not required if a jury instruction could have cured any error. *Id.* at 449.

"Given that a prosecutor's role and responsibility is to seek justice and not merely convict, the test for prosecutorial misconduct is whether a defendant was denied a fair and impartial trial." *People v Dobek*, 274 Mich App 58, 63; 732 NW2d 546 (2007). "Prosecutorial comments must be read as a whole and evaluated in light of defense arguments and the relationship they bear to the evidence admitted at trial." *People v Brown*, 279 Mich App 116, 135; 755 NW2d 664 (2008). Prosecutors are given latitude with regard to their arguments. *People v Bahoda,* 448 Mich 261, 282; 531 NW2d 659 (1995). "They are free to argue the evidence and all reasonable inferences from the evidence as it relates to their theory of the case." *Id.* "The prosecution is permitted to comment on and draw inferences from the testimony of a witness, including a criminal defendant, and may argue that the witness is not worthy of belief." *People v Pegenau*, 447 Mich 278, 299; 523 NW2d 325 (1994).

At the outset, Mahaffey complains about the prosecutor's rebuttal argument that he was suicidal. The prosecutor stated:

> He goes and hides. He goes and hides and he goes out and gets drunk the next night. And then supposedly asks the police officer to shoot him. And it's not because he's sad that his friend died, because after his friend died he just went to the drug dealers house and then he went and got drunk. He's said [sic] because he could be in trouble for what he did and it shows a consciousness of guilt. He's upset that he's going to be in trouble. Not that somebody just died, it's that he's going to be in trouble.

The prosecutor then argued that Mahaffey was "putting on a nice show . . . He has lied in the past . . . That's the person that's asking you to believe him over these other people that came in and testified, people that have the same story the whole time . . . ."

As Mahaffey argues, he never admitted to suicidal feelings during his interrogation and he denied remembering that he told the police to shoot him outside the bar. The prosecutor was free to argue, however, that Mahaffey was not worthy of belief. Even if the prosecutor's argument was improper, Mahaffey cannot establish that the argument affected his substantial rights. *Vandenberg*, 307 Mich App at 61. First, the statement as to suicidal ideation was qualified using the word "supposedly" and a minuscule portion of the argument. Additionally, it was one of several assertions of consciousness of guilt. The trial court instructed the jury to make its own determination of the evidence as the trier of fact and that the attorneys' arguments are not evidence. The court's instructions protected Mahaffey's substantial rights. "Jurors are presumed to follow their instructions, and instructions are presumed to cure most errors." *Abraham,* 256 Mich App at 279. Therefore, Mahaffey cannot establish that he was denied a fair trial.

Second, Mahaffey complains about the prosecutor's argument in rebuttal regarding the text messages between Mahaffey and Jones that were not retrieved from Mahaffey's phone. The evidence at trial showed that Jones's phone records revealed 10 text message communications with Mahaffey's phone that were not among the text messages retrieved from Mahaffey's phone. In defense counsel's closing argument, he stated, "No texts or anything mention robbery or any sort of larceny." In response, the prosecutor argued, "Defense counsel is right, there are no text messages saying anything about a robbery, but I wonder what those ten missing text messages (indiscernible), why he got rid of those." Viewed in context, the prosecutor's remark was properly responsive to the defendant's theory of the case and did not amount to misconduct. *People v Thomas*, 260 Mich App 450, 454; 678 NW2d 631 (2004). Mahaffey is correct that there is no direct evidence in the record explaining why the text messages were not retrieved from his phone. Mahaffey maintains that the jury could reasonably infer that the messages were not retrieved because of an error with the Cellebrite program that was used to retrieve the messages. Detective-Sergeant Stevens testified that she did not know if such mistakes were possible, but the jury could just as reasonably infer that the messages were not retrieved because Mahaffey had deleted them from his phone, which could demonstrate consciousness of guilt. We conclude that the prosecutor's argument was based on permissible inferences from the facts in the record and did not amount to plain error.

## II. DOCKET NO. 342112 (DEFENDANT JONES)

Defendant Jones argues that the trial court erred by denying his motion for appointment of a DNA expert. We disagree. We review a trial court's decision to deny an indigent defendant's motion for the appointment of an expert witness for an abuse of discretion. *People v Carnicom*, 272 Mich App 614, 616; 727 NW2d 399 (2006). An abuse of discretion occurs when the trial court's decision results in an outcome falling outside the range of reasonable and principled outcomes. *Id.* at 616-617. Reversal of a denial of an indigent defendant's request for a court-appointed expert is warranted only if such denial results in a fundamentally unfair trial. *People v Leonard*, 224 Mich App 569, 582-583; 569 NW2d 663 (1997).

In *People v Kennedy*, 502 Mich 206; 917 NW2d 355 (2018), our Supreme Court revised the controlling standard for appointment of an expert witness for an indigent defendant and adopted the analysis set forth in *Ake v Oklahoma*, 470 US 68; 105 S Ct 1087; 84 L Ed 2d 53 (1985). Following *Ake*, our Supreme Court in *Kennedy* explained that due process requires examination of three factors:

> (1) "the private interest that will be affected by the action of the State," (2) "the governmental interest that will be affected if the safeguard is to be provided," and (3) "the probable value of the additional or substitute procedural safeguards that are sought, and the risk of an erroneous deprivation of the affected interest if those safeguards are not provided." [*Kennedy*, 502 Mich at 215, quoting *Ake*, 470 US at 77.]

Although the Supreme Court in *Ake* outlined the proper due-process analysis, it did not indicate how a criminal defendant could demonstrate that he or she was entitled to expert assistance. *Id.* at 225-227. "If . . . the defendant were required to prove in detail with a high degree of certainty that an expert would benefit the defense, the defendant would essentially be tasked with the impossible: to get an expert, the defendant would need to already know what the expert would say." *Id.* at 226. On the other hand, "the defendant's bare assertion that an expert would be beneficial cannot, without more, entitle him or her to an expert; otherwise, every defendant would receive funds for experts upon request." *Id.* Striking a balance between these two extremes, our Supreme Court adopted the following standard:

> "[A] defendant must demonstrate something more than a mere possibility of assistance from a requested expert; due process does not require the government automatically to provide indigent defendants with expert assistance upon demand. Rather . . . a defendant must show the trial court that *there exists a reasonable probability both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial.* Thus, if a defendant wants an expert to assist his attorney in confronting the prosecution's proof—by preparing counsel to cross-examine the prosecution's experts or by providing rebuttal testimony—he must inform the court of the nature of the prosecution's case and how the requested expert would be useful. At the very least, he must inform the trial court about the nature of the crime and the evidence linking him to the crime. By the same token, if the defendant desires the appointment of an expert so that he can present an affirmative defense, . . . he

-14-

must demonstrate a substantial basis for the defense, as the defendant did in *Ake*. In each instance, the defendant's showing must also include a specific description of the expert or experts desired; without this basic information, the court would be unable to grant the defendant's motion, because the court would not know what type of expert was needed. In addition, the defendant should inform the court why the particular expert is necessary. We recognize that defense counsel may be unfamiliar with the specific scientific theories implicated in a case and therefore cannot be expected to provide the court with a detailed analysis of the assistance an appointed expert might provide. We do believe, however, that defense counsel is obligated to inform himself about the specific scientific area in question and to provide the court with as much information as possible concerning the usefulness of the requested expert to the defense's case." [*Kennedy*, 502 Mich at 227, quoting *Moore v Kemp*, 809 F2d 702, 712 (CA 11, 1987) (emphasis added).]

At trial, Jones requested a DNA expert in order to: (1) challenge the prosecution expert's conclusion that Jones's DNA was on the gun, and (2) conduct additional testing to see whether and where Mahaffey's DNA was on the gun. First, Jones could not establish a reasonable probability that an expert would be of assistance in order to challenge the prosecution expert's conclusion that there was "very strong support" that Jones was the contributor to the DNA profile on the trigger swab and the grip swab of the subject gun. Jones admitted in his statements to the police that the gun belonged to him and his counsel conceded at trial that his DNA would be expected on the gun. The defense did not contest that Jones had brought the gun to the scene. Rather, the defense theory at trial was that the gun accidently discharged. Thus, the trial court's denial of Jones's request for a DNA expert to oppose a conceded point could not result in a fundamentally unfair trial.

Second, Jones has not established a reasonable probability that an expert would have been of assistance to establish whether and where Mahaffey's DNA was on the gun. Jones initially claimed that he did not know anything about the shooting and then that Mahaffey shot Capizzo while he watched from an alleyway. Later, Jones maintained that those stories were not true. He instead claimed that the gun accidentally discharged twice on the porch. He claimed that he was in the process of handing the gun to Mahaffey when it discharged the first time. According to Jones's explanation, it discharged before Mahaffey obtained the gun. Jones denied that he and Mahaffey struggled over the gun. Jones instead claimed that a struggle occurred when Capizzo tried to grab the gun, causing the gun to again accidentally discharge, resulting in Capizzo being shot. Based on Jones's own statements, Mahaffey's DNA would not have been on the gun. Therefore, denying an expert for the purpose of testing for Mahaffey's DNA could also not have had any effect on whether Jones received a fundamentally fair trial.

Without the appointment of a DNA expert, Jones was still able to pursue his defense that the shooting was an accident. His recorded explanation to the police regarding his claim of an accidental firing was played for the jury. Both firearms experts agreed that the gun was in very poor condition and had not been properly maintained. Sergeant Lee testified that it was possible for the trigger to be pulled, but because of a malfunction, the cartridge might not fire immediately and an accidental discharge could occur up to 10 seconds later. Defense counsel explained in closing argument that the "theory of it wasn't intentional, it's not just what Mr. Jones told you, several times over and over again in that video, it's corroborated by the

deplorable conditions of the gun. Of course, he takes responsibility of that, that's why involuntary manslaughter."

In sum, the trial court did not abuse its discretion by denying Jones's request for a DNA expert and Jones has failed to demonstrate that the denial resulted in a fundamentally unfair trial.

Affirmed.

/s/ Michael J. Riordan
/s/ Kathleen Jansen
/s/ Cynthia Diane Stephens